# 25-1022

## In the United States Court of Appeals for the Second Circuit

---

HUI MA; LEADERSEL INNOTECH ESG,
PLAINTIFFS-APPELLANTS,

*v.*

TELADOC HEALTH, INC.; JASON GOREVIC; MALA MURTHY;
STEPHANY VERSTRAETE; RICHARD J. NAPOLITANO,
DEFENDANTS-APPELLEES

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 22-4687)
(THE HONORABLE DENISE COTE, J.)*

---

**BRIEF OF APPELLEES**

---

ABIGAIL FRISCH VICE
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006*

DANIEL J. KRAMER
AUDRA J. SOLOWAY
DYLAN O. SMITH
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000*

# TABLE OF CONTENTS

Page

Statement of jurisdiction................................................................1

Statement of the issues ................................................................1

Statement of the case ................................................................1

A.    Factual background ................................................................4

B.    Procedural background ................................................................9

Summary of argument ................................................................14

Standard of review................................................................18

Argument................................................................18

I.    The complaint does not plead a strong inference of scienter as to any defendant ................................................................18

    A.    Plaintiffs do not plead facts supporting scienter by conscious misbehavior or recklessness................................19

        1.    Gorevic ................................................................20

        2.    Verstraete................................................................37

        3.    Murthy ................................................................39

        4.    Napolitano................................................................40

    B.    Plaintiffs do not plead facts supporting motive and opportunity to defraud................................................................41

        1.    Gorevic ................................................................42

        2.    Verstraete................................................................47

        3.    Murthy ................................................................48

    C.    The "core operations" doctrine does not support scienter...........49

    D.    Plaintiffs do not plead facts supporting corporate scienter by way of non-defendant employees................................52

II.    The complaint does not plead loss causation................................55

III.    The district court appropriately dismissed with prejudice and denied leave to amend................................................................60

Conclusion................................................................61

# TABLE OF AUTHORITIES

## CASES

*Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995)...........................18, 19

*Amgen Inc.* v. *Connecticut Retirement Plans & Trust Funds*,
    568 U.S. 455 (2013)...........................................................................18

*AppHarvest Securities Litigation, In re*,
    684 F. Supp. 3d 201 (S.D.N.Y. 2023)...............................................39

*Aratana Therapeutics Inc. Securities Litigation, In re*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018)...............................................44

*Arkansas Public Employees' Retirement System* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022)....................................*passim*

*Avon Pension Fund* v. *GlaxoSmith Kline PLC*,
    343 Fed. Appx. 671 (2d Cir. 2009) ...................................................42

*Avon Securities Litigation, In re*, Civ. No. 19-01420,
    2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)...................................52

*Boguslavsky* v. *Kaplan*, 159 F.3d 715 (2d Cir. 1998)........................................55

*Bristol-Myers Squibb Securities Litigation, In re*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)...............................................42

*Buxbaum* v. *Deutsche Bank A.G.*, Civ. No. 98-8460,
    2000 WL 33912712 (S.D.N.Y. Mar. 7, 2000).....................................52

*Central States, Southeastern & Southwestern Areas Pension
    Fund* v. *Federal Home Loan Mortgage Corp.*,
    543 Fed. Appx. 72 (2d Cir. 2013) .....................................................59

*Chembio Diagnostics, Inc. Securities Litigation, In re*,
    586 F. Supp. 3d 199 (E.D.N.Y. 2022)...............................................32

*City of Dearborn Heights Act 345 Police & Fire R* v. *Axonyx, Inc.*,
    374 Fed. Appx. 83 (2d Cir. 2010) .....................................................25

Page

Cases—continued:

*City of Hollywood Police Officers' Retirement System* v. *Henry
Schein, Inc.*, 552 F. Supp. 3d 406 (E.D.N.Y. 2021) .......................34

*City of Omaha Police & Fire Retirement System* v. *Evoqua Water
Technologies Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. 2020) ..............20, 38, 50

*City of Pontiac General Employees' Retirement System*
v. *Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012)..........32, 38

*City of Taylor General Employees Retirement System* v. *Magna
International Inc.*, 967 F. Supp. 2d 771 (S.D.N.Y. 2013)............................46

*City of Warren Police & Fire Retirement System* v. *World Wrestling
Entertainment Inc.*, 477 F. Supp. 3d 123 (S.D.N.Y. 2020) ...................27, 52

*Cosmas* v. *Hassett*, 886 F.2d 8 (2d Cir. 1989) .................................................50

*DDAVP Direct Purchaser Antitrust Litigation, In re*,
585 F.3d 677 (2d Cir. 2009) .......................................................................20

*Diebold Nixdorf, Inc., Securities Litigation, In re*,
Civ. No. 19-6180, 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ....................50

*Dolgow* v. *Anderson*, 438 F.2d 825 (2d Cir. 1970) ...........................................45

*DoubleLine Capital LP* v. *Odebrecht Finance, Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018)...........................................................60

*DraftKings Inc. Securities Litigation, In re*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)...........................................................42

*ECA, Local 134 IBEW Joint Pension Trust* v. *JP Morgan
Chase Co.*, 553 F.3d 187 (2d Cir. 2009) .........................................18, 19, 41, 49

*Employees' Retirement System* v. *Blanford*,
794 F.3d 297 (2d Cir. 2015) ........................................................................26

*eSpeed, Inc. Securities Litigation, In re*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006)...........................................................45

iii

Page

Cases—continued:

*Extreme Networks, Inc. Securities Litigation, In re,*
    Civ. No. 15-04883, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ..........27, 51

*Fadem* v. *Ford Motor Co.*, 352 F. Supp. 2d 501 (S.D.N.Y. 2005) .....................30

*Freudenberg* v. *E\*Trade Financial Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................27, 44, 45

*Frontier Communications, Corp. Shareholders Litigation, In re,*
    Civ. No. 17-1617, 2020 WL 1430019 (D. Conn. Mar. 24, 2020) ...................59

*Galestan* v. *OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)..............................................................31

*Gauquie* v. *Albany Molecular Research, Inc.*,
    Civ. No. 14-6637, 2016 WL 4007591 (E.D.N.Y. July 26, 2016) .............33, 34

*Gimpel* v. *Hain Celestial Group, Inc. Securities Litigation,*
    --- F.4th ---, 2025 WL 2749562 (2d Cir. Sept. 29, 2025) ...................27, 28, 49

*Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011) .........................42, 47

*Gross* v. *Rell*, 585 F.3d 72 (2d Cir. 2009) ........................................................36, 60

*Hain Celestial Group, Inc. Securities Litigation, In re,*
    20 F.4th 131 (2d Cir. 2021).......................................................................27, 28

*Hawaii Structural Ironworkers Pension Trust Fund* v. *AMC
    Entertainment Holdings, Inc.*, 422 F. Supp. 3d 821 (S.D.N.Y. 2019)........51

*Hi-Crush Partners L.P. Securities Litigation, In re,*
    Civ. No. 12-8557, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013).................51, 52

*IBEW Local Union Number 58 Pension Trust Fund & Annuity
    Fund* v. *Royal Bank of Scotland Group, PLC,*
    783 F.3d 383 (2d Cir. 2015) ...........................................................................18

*Initial Public Offering Securities Litigation, In re,*
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)..............................................................43

iv

Page

Cases—continued:

*IWA Forest Industry Pension Plan* v. *Textron Inc.*,
14 F.4th 141 (2d Cir. 2021)...............................................................18

*Jackson* v. *Abernathy*, 960 F.3d 94 (2d Cir. 2020) ...........................52, 53, 54, 55

*Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ...........................56

*Local No. 38 International Brotherhood of Electrical Workers
Pension Fund* v. *American Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010)..............................................29

*Loreley Financing (Jersey) No. 3 Ltd.* v. *Wells Fargo Securities, LLC*,
797 F.3d 160 (2d Cir. 2015) .......................................................22, 53

*Lululemon Securities Litigation, In re*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014).................................................48

*Magnum Hunter Resources Corp. Securities Litigation, In re*,
616 Fed. Appx. 442 (2d Cir. 2015) .................................................26

*Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27 (2011) ...........................18

*Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014) ....................35

*Nandkumar* v. *AstraZeneca PLC*, Civ. No. 22-2704,
2023 WL 3477164 (2d Cir. May 16, 2023).....................................22

*New England Carpenters Guaranteed Annuity & Pension
Funds* v. *DeCarlo*, 122 F.4th 28 (2d Cir. 2023)..........................33, 34

*New Orleans Employees Retirement* v. *Celestica, Inc.*,
455 Fed. Appx. 10 (2d Cir. 2011) ...............................................27, 49

*North Collier Fire Control & Rescue District Firefighter
Pension Plan* v. *MDC Partners, Inc.*, Civ. No. 15-6034,
2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ...............................43

*Novak* v. *Kasaks*, 216 F.3d 300 (2d Cir. 2000) .............................................19, 41

Page

Cases—continued:

*Nursing Home Pension Fund, Local 144* v. *Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004).......................................52

*Omnicom Group, Inc. Securities Litigation, In re*,
   597 F.3d 501 (2d Cir. 2010) .......................... 55-56, 57-58

*Oxford Health Plans, Inc.*, *In re*, 187 F.R.D. 133 (S.D.N.Y. 1999).................43

*Piedmont Lithium Inc. Securities Litigation, In re*,
   712 F. Supp. 3d 301 (E.D.N.Y. 2024).......................45, 46

*Plumbers & Pipefitters National Pension Fund* v. *Orthofix
   International N.V.*, 89 F. Supp. 3d 602 (S.D.N.Y. 2015) ...........................27

*Rex & Roberta Ling Living Trust* v. *B Communications Ltd.*,
   346 F. Supp. 3d 389 (S.D.N.Y. 2018).......................53, 54

*Rothman* v. *Gregor*, 220 F.3d 81 (2d Cir. 2000).......................43

*Salix Pharmaceuticals, Ltd., In re*, Civ. No. 14-8925,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ....................34

*Saraf* v. *Ebix, Inc.*, Civ No. 23-1182,
   2024 WL 1298246 (2d Cir. Mar. 27, 2024) ....................22

*SET Capital LLC* v. *Credit Suisse Group AG*,
   996 F.3d 64 (2d Cir. 2021) .......................35

*Scholastic Corp. Securities Litigation, In re*,
   252 F.3d 63 (2d Cir. 2001) .......................41

*Silicon Graphics Inc. Securities Litigation, In re*,
   183 F.3d 970 (9th Cir. 1999).......................45

*SLM Corp. Securities Litigation, In re*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010).......................46

*Take-Two Interactive Securities Litigation, In re*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008).......................44

Page

Cases—continued:

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............19, 44

*Town of Davie Police Officers Retirement System* v. *City of North Miami Beach Police Officers' & Firefighters' Retirement Plan*, Civ. No. 21-909, 2021 WL 5142702 (2d Cir. Nov. 5, 2021) .................................................23, 24

*Tung* v. *Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453 (S.D.N.Y. 2019).......42

*Turquoise Hill Resources Ltd. Securities Litigation, In re*, 625 F. Supp. 3d 164 (S.D.N.Y. 2022).................................................................31

*Van Dongen* v. *CNinsure Inc.*, 951 F. Supp. 2d 457 (S.D.N.Y. 2013)..............46

*Virtu Financial, Inc. Securities Litigation, In re*, 770 F. Supp. 3d 482 (E.D.N.Y. 2025) .........................................................32

*Wachovia Equity Securities Litigation, In re*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011).................................................40, 49, 50

*Weston* v. *DocuSign, Inc.*, 669 F. Supp. 3d 849 (N.D. Cal. 2023)....................31

*Woolgar* v. *Kingstone Co., Inc.*, 477 F. Supp. 3d 193 (S.D.N.Y. 2020) ............25

## STATUTES, REGULATIONS, AND RULES

Private Securities Litigation Reform Act.................................................*passim*

    15 U.S.C. § 78u-4(b)(1) .................................................................................10

Securities Exchange Act of 1934..........................................................................1

    Section 10(b), 15 U.S.C. § 78j(b) .............................................................10, 18

    Section 20(a), 15 U.S.C. § 78t(a).................................................................10

28 U.S.C. § 1291 .................................................................................................1

28 U.S.C. § 1331 .................................................................................................1

vii

Page

Regulations and rules—continued:

17 C.F.R. § 240.10b-5.................................................................18

17 C.F.R. § 240.10b-5(a)-(c) .....................................................10

17 C.F.R. § 240.10b5-1..................................................*passim*

Fed. R. Civ. P. 9(b) ...................................................................18

Fed. R. Civ. P. 12(b)(6)............................................................18

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. The district court entered final judgment on March 24, 2025. S.A. 32. Appellants filed a timely notice of appeal April 22, 2025. J.A. 15. The jurisdiction of this Court rests on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly concluded that the complaint fails to plead a strong inference of scienter for any defendant, as required by the Private Securities Litigation Reform Act (PSLRA), to assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

2.      Whether the complaint adequately pleads the required element of loss causation, where none of the alleged corrective disclosures addresses the topic of any remaining alleged misstatement, and one alleged corrective disclosure predates two of the four alleged misstatements (and thus cannot correct them).

## STATEMENT OF THE CASE

Plaintiffs are shareholders of Teladoc, a virtual healthcare provider. They originally asserted two unrelated fraud theories, an integration theory and a competition theory, based on dozens of alleged misstatements. Following an earlier motion to dismiss and a prior trip to this Court, however, plaintiffs are left with a narrowed claim: that defendants made four misstatements

concerning particular steps in Teladoc's integration with Livongo after their 2020 merger. In particular, this Court previously determined that the complaint adequately pleaded falsity as to two statements that sales teams were "fully integrated"; one statement that "marketing data and tech stacks" were integrated; and a Form 10-K risk disclosure that identified as "possible" certain integration difficulties.

On remand, the district court granted defendants' renewed motion to dismiss, finding that the alleged facts fail to support the requisite strong inference of scienter by any defendant. That decision was correct, and plaintiffs raise no persuasive reason to disturb it.

The district court faithfully applied controlling law, which requires particularized facts showing motive and opportunity to commit fraud, or strong circumstantial allegations of conscious misbehavior or recklessness. As the district court correctly found, the complaint demonstrates no motive to lie. To the contrary, the complaint invokes executive stock sales that *undermine* an inference of scienter, because defendants increased their holdings of Teladoc stock, sold in patterns consistent with earlier periods, and sold under Rule 10b5-1 trading plans or to satisfy tax obligations. Moreover, defendants consistently stated that various integration efforts were ongoing and faced challenges, including due to the global pandemic. Plaintiffs offer no coherent narrative to explain why—while continuing to flag truthfully that other aspects of

2

the integration remained in progress, and increasing their own stock holdings—defendants would intentionally mislead shareholders about sales team and marketing data integration efforts in particular.

On appeal, plaintiffs largely argue that their allegations demonstrate conscious misbehavior or recklessness, which—absent motive—imposes a correspondingly greater burden on plaintiffs to plead specific facts. To that end, plaintiffs rely on a jumble of allegations by confidential witnesses (CWs). The district court methodically categorized these allegations by topic, however, and correctly concluded that—to the extent the junior-level CWs offer any allegations about the individual defendants at all—their allegations do not demonstrate that defendants had inconsistent information on the subjects of the four challenged statements.

Accordingly, the pleaded facts do not permit a strong inference that any defendant spoke with intent to deceive. The far more compelling inference is that senior executives consistently acknowledged that integration efforts generally were complex and ongoing; sought to keep shareholders informed by providing interim updates on integration tasks; and, given their senior-level roles and lack of contact with the junior-level CWs, were not informed of the alleged shortcomings the CWs now report—namely, that some sales teams allegedly were not "fully" integrated, or that a single marketing application, Tableau, was not integrated.

Nor, as the district court correctly held, can plaintiffs satisfy the rigorous pleading requirements by invoking the purported "magnitude" of the fraud, the "specificity" of alleged misstatements, or the "core operations" and "corporate scienter" theories. These doctrines are no substitute for well-pleaded facts about each of the defendants and their states of mind, and, in any event, the conditions for applying these principles are not met on the facts alleged here.

The district court did not (and did not need to) go further; however, loss causation provides an alternative ground for this Court to affirm. Plaintiffs identify three stock drops from so-called "corrective disclosures." But plaintiffs must identify corrective, new information on the topics of the four remaining statements, which the claimed corrective disclosures do not contain. Loss causation is thus a separate grounds for dismissal.

For all these reasons, the Court should affirm.

## A. Factual Background

1. Teladoc provides virtual healthcare services to consumers through a network of qualified providers. J.A. 46, ¶ 67. During the relevant period, individual defendants Jason Gorevic, Mala Murthy, Richard Napolitano, and Stephany Verstraete were, respectively, Teladoc's Chief Executive Officer; Chief Financial Officer; Senior Vice President, Chief Accounting Officer and Controller; and Chief Marketing & Engagement Officer. J.A. 40-41,¶¶ 50-52,

4

54-55. Plaintiffs also rely on allegations concerning non-parties David Sides, Teladoc's Chief Operating Officer, J.A. 77, ¶ 144, and Joe DeVivo, President of the Hospitals & Health Systems division, J.A. 114, ¶ 235 n.33.

On August 5, 2020, Teladoc announced its decision to merge with Livongo, a provider of healthcare monitoring products and services. J.A. 52-53, ¶¶ 82-86. The $18.5 billion Livongo deal, "a record in the telehealth industry," would combine Teladoc and Livongo to become "the largest telehealth company." J.A. 52, ¶¶ 82-83. That acquisition expanded Teladoc's product portfolio "with the goal of staying competitive by providing full-spectrum, 'whole-person' virtual care." J.A. 46, ¶ 68.

Before the merger, Teladoc filed a form S-4 stating that the integration "may be more difficult, costly or time-consuming than expected[,] and the combined company may fail to realize the anticipated benefits of the merger." J.A. 380. Teladoc listed various "issues" that would need to be "addressed" in order to successfully integrate, including "combining the companies' operations and corporate functions," "integrating personnel from the two companies," "integrating the companies' technologies," and "integrating and unifying the offerings and services." J.A. 381.

2.     The merger between Teladoc and Livongo closed on October 30, 2020. J.A. 59, ¶ 103. Over the following year, defendants Gorevic, Verstraete,

Murthy, and Napolitano made various statements addressing the ongoing integration efforts. Four such statements remain at issue.

*First*, on February 24, 2021, Teladoc held an earnings call to discuss its Q4 2020 financial results. J.A. 141, ¶ 307. During that call, Gorevic stated that the company's "commercial organization"—*i.e.*, sales teams—were "now fully integrated, and [the] teams responsible for cross-selling have been collaborating for months." J.A. 141, ¶ 308. In addition, Gorevic emphasized that other integration efforts were ongoing, noting continued "progress" on "[t]he integration of [Teladoc's] data platform and assets" including one "opportunity" for "a new integrated behavioral health product that combines the capabilities of both Livongo and Teladoc." *Id.* Similarly, a few weeks later, Gorevic participated in an episode of former Senator Bill Frist's podcast and, while sharing his optimism, acknowledged that "there are certainly challenges" with the integration, including that—against the background of the COVID-19 pandemic—"we've never been in the same room together." J.A. 149-150, ¶¶ 328-329.

*Second*, on April 28, 2021, Teladoc held an earnings call to discuss its Q1 2021 financial results. J.A. 152, ¶ 335. During that call, Gorevic repeated that the "commercial organization has been fully integrated with sales teams selling across the entire whole-person portfolio of products since early this year."

J.A. 152, ¶ 336. Gorevic also provided "an update on integration," noting "considerable progress across [Teladoc's] key work streams." J.A. 1119. He added that the company had "closed several deals for [its] new integrated mental health product," which combined Teladoc and Livongo resources and "enabled the first wave of members to access and register for Livongo programs from within the Teladoc app." J.A. 152, ¶ 336. Gorevic described that as "an important first step." J.A. 1119; *see also id.* (describing "first wave" of product integration for a single customer).

*Third*, on November 18, 2021, Teladoc hosted its 2021 Investor Day. J.A. 170, ¶ 392. During the event, Verstraete commented: "Now if we were to look under the proverbial hood of the engagement engine, over the course of this year, we've significantly deepened our capabilities as we brought together and integrated the legacy Livongo and Teladoc marketing data and tech stacks, right?" *Id.*

*Fourth*, on February 28, 2022, Teladoc filed its 2021 Form 10-K, signed by Gorevic, Murthy, and Napolitano. J.A. 175, ¶ 407. It described "potential difficulties [that Teladoc] may encounter in the integration process," and listed eight categories of risks. J.A. 176, ¶ 409.

3.     Plaintiffs assert that they suffered stock drop losses following three disclosures, which they allege corrected the four misstatements.

*First*, on November 10, 2021, *Business Insider* published an article discussing Teladoc's integration of Livongo. J.A. 168, ¶ 383. The article reports that the merger precipitated a "rushed union" because Teladoc's "client operations" department was required to integrate with Livongo's team "by January 1," and it describes Teladoc as having "quickly brought" the Livongo team "into Teladoc." J.A. 1192-1193. The article acknowledges that the sales teams had a "hard time" cross-selling products, but confirms that the sales teams were, in fact, cross-selling. J.A. 1093. The article details Teladoc's efforts to "sell Livongo's services," and notes that "[b]ig companies have been more receptive to buying combined Livongo and Teladoc services." J.A. 1095, 1097. The article also describes other integration challenges, including employee attrition and a "culture clash" between the two companies. J.A. 107, ¶ 219. The article cites a "spokesperson" who "acknowledged the integration was an issue in the first six months but said was less of an issue today." J.A. 122, ¶ 260 (emphasis omitted).

*Second*, on April 27, 2022, Teladoc held an earnings call to discuss its Q1 2022 financial results. J.A. 179, ¶ 420. Teladoc revised its FY 2022 revenue and earnings projections downwards, to reflect "dynamics" the company was "currently seeing" in the direct-to-consumer mental health and chronic condition markets. J.A. 1211-1212. Teladoc reported a net loss per share of $41.58 driven by a goodwill impairment of $6.6 billion. J.A. 123, ¶ 420. Gorevic also

noted the ongoing product integration efforts: "[O]ver the last 12-plus months, we've been working on integrating the Livongo products into our whole-person care experience," concluding "we're not done with that yet." J.A. 187, ¶ 451 (emphasis omitted).

*Third*, on July 27, 2022, Teladoc held an earnings call to discuss its Q2 2022 financial results. J.A. 195, ¶ 478. Teladoc reported a net loss per share of $19.22, driven by a second goodwill impairment charge of $3 billion. *Id.* Gorevic explained that the company "continue[d] to see our pipeline of Chronic Care deals develop[] more slowly than [it] anticipated at the start of the year." J.A. 196, ¶ 482. He also stated that the "heightened economic uncertainty over the past several months [was] increasingly playing a part." J.A. 1210. Separately, describing research and development efforts, Murthy observed that "continued integration of our data that underpins bringing together all of our suite of products . . . still continues." J.A. 197, ¶ 480.

## B.    Procedural Background

1.    The original complaint was filed on June 6, 2022. J.A. 5. After appointing a lead plaintiff, the district court (Cote, J.) issued a schedule for filing amended pleadings and dispositive motions. J.A. 8-9. The court instructed that, if defendants moved to dismiss the amended complaint, plaintiffs could either oppose or file a second amended complaint. *Id.* The court explained that, if defendants moved to dismiss a second amended complaint,

and plaintiffs chose to oppose, it was "unlikely" plaintiffs would be allowed to file a third amended complaint. J.A. 9.

Plaintiffs filed the first amended complaint and defendants moved to dismiss. J.A. 9-10. Instead of opposing, plaintiffs filed the second amended complaint. J.A. 10, 16-229. Asserting claims under Sections 10(b) and 20(a) of the Securities and Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5(a)-(c), the second amended complaint challenged numerous statements by defendants, under two different fraud theories. *Id.* The first theory, relevant here, was that defendants misrepresented the progress of Teladoc's integration of the Livongo business. The second theory was that defendants misrepresented the competitive pressures faced by the chronic care business, as revealed by disappointing financial results for Q1 2022 and Q2 2022. *See, e.g.*, J.A. 93-120, ¶¶ 232-250.

2. Defendants filed their second motion to dismiss, arguing that the complaint did not state a claim because the facts alleged did not demonstrate any material misstatement or omission, made with scienter, that caused loss. *See* J.A. 10-11. The district court dismissed all alleged misstatements on the ground of falsity. J.A. 245-257. The district court also denied plaintiffs' request for leave to amend, explaining that plaintiffs had "not identified how further amendment would address the deficiencies" in the complaint, nor had they "attached a proposed amended complaint." J.A. 257.

3.      Plaintiffs appealed, challenging only the dismissal of certain integration-related statements and abandoning the competition theory entirely. J.A. 261 n.1. This Court issued a summary order affirming in part, vacating in part, and remanding for further proceedings. J.A. 260. The Court agreed with the district court that many alleged misstatements were not actionable. J.A. 263-266. The Court held, however, that four statements were adequately alleged to be false or misleading.

With respect to Gorevic's statements on February 24, 2021 and April 28, 2021, that the sales teams were "fully integrated," the Court concluded that falsity was pleaded because the complaint included "statements from multiple confidential witnesses who worked for Livongo in the relevant timeframe and who provided details as to the lack of integration in the sales teams at the time Gorevic's statements regarding full integration were made." J.A. 267.

The Court also concluded that the complaint alleged falsity for Verstraete's November 18, 2021 statement that "we brought together and integrated the legacy Livongo and Teladoc marketing data and tech stacks." *See* J.A. 170, ¶ 392; J.A. 268. The Court relied on CW allegations that "marketing data and tech stacks" included Tableau, a program that Teladoc did not integrate until after Verstraete's statement. J.A. 269.

Finally, the Court determined that the falsity of Teladoc's February 2022 risk disclosure about "potential" integration difficulties was adequately

pleaded, because the complaint "contains specific allegations that are sufficient to plausibly support a finding" that, by February 2022, integration-related risks "had already materialized and resulted in a significant disruption to Teladoc's business." J.A. 269.

The Court "decline[d]" to consider Teladoc's arguments that the complaint "failed to adequately plead scienter and loss causation," leaving those arguments for the district court to consider in the first instance. J.A. 270.

4. On remand, defendants filed another motion to dismiss the second amended complaint. J.A. 14, 273-301. Defendants argued that the complaint did not plead facts supporting a strong inference of fraudulent intent or loss causation. J.A. 283-300.

The district court granted the motion, addressing only scienter and concluding that "the pleadings support neither an inference of conscious misbehavior or recklessness, nor an inference of motive and opportunity to commit fraud." S.A. 30. With respect to Gorevic, the district court explained that the complaint "does not describe any conversations with Gorevic, or any written communications to or from him, regarding sales team integration problems." S.A. 14. As to Verstraete, the district court concluded that nothing in the complaint, "including the allegations of confidential witnesses, indicat[es] that Verstraete 'had access to contrary facts' that would alert her that the integration of Tableau was incomplete." S.A. 19 (citation omitted).

12

Next, the district court determined that the complaint failed to allege scienter as to Gorevic, Murthy, or Napolitano with respect to the 10-K statement. S.A. 21-27. As to the risk disclosure regarding "the integration of management teams, strategies, technologies and operations, products and services," the district court construed plaintiffs' briefing as advancing that three risks had materialized: "(1) sales team integration problems; (2) delays in Tableau integration; and (3) delays in Salesforce integration." S.A. 25. The district court methodically addressed each, and found that the complaint "offer[ed] no meaningful allegations" that the individual defendants knew those risks had materialized. S.A. 25-27. For the remaining disclosed risks, the district court determined that plaintiffs had not developed, and had therefore abandoned, any argument that those risks had materialized as of February 2022. S.A. 24 & n.5.

The district court was also unpersuaded by plaintiffs' arguments invoking the core operations doctrine. S.A. 27. Assuming the doctrine applied, and that "the overall integration with Livongo" would be a "core operation" of Teladoc, the district court rejected the notion that the "more specific subjects" of the remaining alleged misstatements, such as sales team and Tableau integration, are "so central to the integration process" as to justify inferring knowledge by senior executives. *Id.* The court also determined that the al-

13

leged facts do not demonstrate the "exceedingly rare" circumstances that justify a finding of scienter based on non-defendant employees who did not make the challenged statements and are not alleged to have participated in their dissemination. S.A. 17 n.4.

With respect to motive and opportunity, the district court determined that the stock sales of Gorevic, Verstraete, and Murthy were not unusual or suspicious because their sales "increased, rather than decreased, their overall ownership of Teladoc stock during the Class Period." S.A. 28. Moreover, many of the sales were made pursuant to 10b5-1 plans or for tax planning. *Id.*

The district court did not reach defendants' loss causation arguments. S.A. 10 n.2.

This appeal followed.

## SUMMARY OF ARGUMENT

I.    The complaint fails to state a securities fraud claim because the facts alleged do not support a strong inference that any defendant made the alleged misrepresentations with scienter. The requisite inference of fraudulent intent is satisfied by either allegations that demonstrate motive and opportunity to defraud, or that constitute strong circumstantial evidence of conscious misbehavior or recklessness. The complaint pleads neither.

A.    Appellant here largely argues that the complaint pleads scienter by identifying alleged contemporaneous information known by the individual

14

defendants that contradicted their public statements. Under the controlling law in this circuit, however, appellants must identify, with particularity, a report, internal communication, or other internal information by which the individual defendants allegedly learned such contradictory information. The district court carefully considered all of the factual allegations, and correctly held that the CW allegations and documents cited in the complaint provide no such support.

As to Gorevic, plaintiffs enlist a handful of CW anecdotes, some of which indicate lower-level employee concerns about sales-team integration, and some of which indicate communications with Gorevic. But scienter requires the combination of both, which the facts alleged do not establish. While CW2, for example, raises concerns about Gorevic pitching a client, pre-merger, to develop a new product, that has nothing to do with sales team integration, and, in any event, CW2 does not claim that she communicated her concerns to Gorevic. Similarly, additional CWs assert that Gorevic fielded questions at town-hall meetings during which the integration was discussed, and that they were dissatisfied with his answers. But, strikingly, none of these CWs describes any particular question posed to Gorevic, let alone one that would have alerted him that the sales teams were not actually integrated. And their opinions on the quality of his answers shed no light on what information Gorevic had at the time. Nor do plaintiffs allege facts demonstrating Gorevic's

knowledge in February 2022 that particular integration risks disclosed in the 10-K were causing harm to Teladoc's business (*i.e.*, had "materialized").

About Verstraete, Murthy, and Napolitano, the complaint has even less to say. The complaint does not identify any information known to Verstrate about Tableau, the marketing program that allegedly was not yet integrated. And the complaint does not identify any information known to Murthy or Napolitano that would support their intent to defraud with respect to the allegedly false 10-K risk disclosure.

B.     The district court also correctly determined that the complaint does not demonstrate that any defendant had motive and opportunity to defraud. Because executive stock sales are routine, sales can establish motive only where trading is suspicious in volume or timing. Merely citing large proceeds does not demonstrate scienter. And here, the stock sales *undermine* any inference of scienter because the individual defendants increased their net holdings over the class period. Their stock sales were also made pursuant to Rule 10b5-1 trading plans or for tax purposes. Such sales are presumptively not suspicious, and no alleged facts undermine that presumption here.

C.     The PSLRA does not permit plaintiffs to invoke the "core operations doctrine" as a substitute for particularized factual allegations showing knowledge by defendants. In any event, the complaint alleges that Teladoc's core business is healthcare, not its one-time merger with Livongo. And even

16

if integration itself could ever be a "core operation," the allegedly misrepresented information here is far from "core." That the merger was important does not support an inference that senior executives of a large healthcare corporation knew the details of incomplete sales team or Tableau integration that allegedly render the challenged statements false.

D. The district court correctly concluded that the complaint fails to allege scienter under the rarely applicable corporate scienter theory. The identified non-defendant individuals are not alleged to have had fraudulent intent, knowledge of contradictory information, or any role in disseminating the alleged misstatements.

II. The complaint also does not plead that the alleged misstatements caused plaintiffs' losses. Only one corrective disclosure, the *Business Insider* article, even provided new information about integration efforts, and, as plaintiffs concede, it could not have corrected two of the four challenged statements because it preceded them. The *Business Insider* article also did not correct Gorevic's two prior statements about sales team integration, because it reported that the sales teams had been required to merge earlier that year and were cross-selling products—which aligns with, rather than refutes, Gorevic's statements on sales team integration. The other two corrective disclosures reported goodwill impairments and disappointing financial results from com-

17

petitive pressures, which were the subject of plaintiffs' second, now-abandoned fraud theory, and not the topic of any misstatements remaining in this case.

## STANDARD OF REVIEW

This Court reviews de novo a dismissal under Rule 12(b)(6). *IWA Forest Industry Pension Plan* v. *Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021). To state a claim for violation of Section 10(b) and Rule 10b-5, a plaintiff must allege, as relevant here, scienter and loss causation. *See Amgen Inc.* v. *Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 460-461 (2013) (quoting *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 37-38 (2011)). Securities fraud claims are subject to the heightened pleading standards of the PSLRA and Rule 9(b), which require plaintiffs to state "with particularity the circumstances constituting fraud." *IBEW Local Union Number 58 Pension Trust Fund & Annuity Fund* v. *Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (quoting *ECA, Local 134 IBEW Joint Pension Trust* v. *JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)).

## ARGUMENT

## I. THE COMPLAINT DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER AS TO ANY DEFENDANT

To plead the element of scienter, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). Such an inference "must be more than merely

18

'reasonable' or 'permissible'—it must be cogent and compelling," and "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). No such inference is justified here.

This Court has explained that establishing scienter requires a plaintiff to allege facts that either "show defendants had both motive and opportunity to commit fraud" or "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak* v. *Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (quoting *Acito*, 47 F.3d at 52). Absent motive, "the strength of the circumstantial allegations must be correspondingly greater." *ECA, Local 134 IBEW Joint Pension Trust* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198-199 (2d Cir. 2009). Conscious misbehavior "encompasses deliberate illegal behavior." *Novak*, 216 F.3d at 308. Recklessness requires "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 308).

## A. Plaintiffs Do Not Plead Facts Supporting Scienter By Conscious Misbehavior Or Recklessness

When, as here, a plaintiff's theory of scienter is that "defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *See Novak*, 216 F.3d at 309. And plaintiffs are required to plead specific facts establishing scienter as to each defendant.

19

*See, e.g.*, *City of Omaha Police & Fire Retirement System* v. *Evoqua Water Technologies Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020) (explaining that, where multiple defendants are named, "'plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible.'") (quoting *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 695 (2d Cir. 2009)).

### 1. Gorevic

The district court correctly concluded that the alleged facts do not demonstrate conscious misbehavior or recklessness by Gorevic because "[n]one of the allegations in the [complaint] provide strong circumstantial evidence that Gorevic *knew* [his] statements were misleading." S.A. 14 (emphasis added). Plaintiffs' arguments to the contrary lack merit.

### a. Sales Team Integration Statements

Plaintiffs advance four theories in an effort to demonstrate that Gorevic recklessly misled shareholders about sales team integration. These involve: (1) CW allegations concerning actions and statements by Gorevic, Br. 26-40; (2) the knowledge of his subordinates, Br. 41-44; (3) the specificity of his statements, Br. 44-46; and (4) the magnitude of the falsity, Br. 46-47. Each theory falls short.

### i.  CW Allegations

Plaintiffs rely on CWs 1, 2, 4, and 5 to plead that Gorevic knew that the sales teams were not fully integrated.  Br. 27-38.  But the facts actually alleged in the complaint do not plead that these CWs ever discussed this issue with Gorevic, or otherwise were in a position to attest to his awareness of the allegedly incomplete sales team integration.

*First*, plaintiffs rely on an anecdote from CW2, *see* Br. 27-31, a Livongo sales employee who later worked in one of five sales regions and was at least three levels removed from Gorevic.  J.A. 42, ¶ 57.[1]  In paragraphs 134-141 of the complaint, CW2 describes her discomfort that Gorevic had pitched an integrated product that was not yet developed.  J.A. 72-76.  Specifically, CW2 related that, on October 29, 2020—before the merger closed—she learned that Gorevic "had a call" with a "high-level executive" at a healthcare company, and "discussed the possibility of Teladoc 'co-developing'" a subscription model encompassing urgent care and chronic care.  *See* Br. of Appellant 27-28; J.A. 75, ¶ 139.  CW2 sent emails expressing her disapproval to several recipients; Gorevic is not among them.  J.A. 73-76, ¶¶ 135-143.

These allegations show nothing.  That Gorevic pitched to co-develop a future product with a large prospective client in October 2020—and that CW2

---

[1] Plaintiffs also cite paragraph 513, which is addressed at p. 22 n.2, *infra*, with their argument premised on Gorevic's involvement.  Plaintiffs also cite paragraphs 517-519, which materially repeat paragraphs 139-140.

21

disapproved, *see* J.A. 30, ¶ 23—has no bearing on the status of sales team integration months later, in February and April 2021. Plaintiffs attempt to link these unrelated points: they say, if Gorevic was making a sales pitch, he must have been in the field months later, and known that the sales teams were not fully integrated.[2] *See* Br. 28-29. But Gorevic's phone call with a prospective large client, without any other alleged participants on the call, *see e.g.*, J.A. 30, ¶ 23, hardly exposes him, the CEO, to broad knowledge of the workaday operations of sales teams. CW2 does not claim that she communicated with him at all, much less that she raised to him any concerns about sales team integration.[3] *See id.*

---

[2] Even if Gorevic was "hands-on," Br. 29, knowledge of falsity cannot simply be assumed by an active management style. *See Nandkumar* v. *AstraZeneca PLC*, Civ. No. 22-2704, 2023 WL 3477164, at *4 (2d Cir. May 16, 2023) (summary order) (concluding that allegations of a defendant's significant involvement are not sufficient because they "lack specificity as to what information the [i]ndividual [d]efendants allegedly knew").

[3] As this Court has explained, plaintiffs cannot establish scienter by relying on CWs not alleged to have conveyed their concerns to the defendant, or any other basis to know what information the defendant possessed. *Compare Saraf* v. *Ebix, Inc.*, Civ No. 23-1182, 2024 WL 1298246, at *3 n.3 (2d Cir. Mar. 27, 2024) (summary order) (no scienter where CW concerns not conveyed to defendant), *with Loreley Financing (Jersey) No. 3 Ltd.* v. *Wells Fargo Securities, LLC*, 797 F.3d 160, 175-176 (2d Cir. 2015) (finding scienter where emails linked defendant to allegedly misrepresented information).

*Second*, plaintiffs point to CW2, CW1, and CW5, who "recount[] that Gorevic regularly discussed Livongo integration problems at internal meetings." Br. 31. For example, CW2 "recalled questions coming into the townhall through the chat function about difficulties the Company faced regarding the integration or other issues," and she perceived that Gorevic "either avoided [them]" or gave answers that were not "directly respon[sive]." J.A. 206, ¶ 515 (emphasis omitted). CW1 recalls that Gorevic "discussed the integration timelines" at meetings, and that "timelines were often missed." J.A. 87, ¶ 168. And CW5 alleged that "the integration wasn't complete by the time she left in June 2021." J.A. 105, ¶ 212.[4]

These allegations do not plead that incomplete sales team integration was raised with Gorevic, what was said, or when that happened. Indeed, it is striking that, for all their length and repetition, the CW accounts of vaguely described internal meetings do not identify a single such instance. As this Court has explained, scienter cannot be inferred from a defendant's attendance at meetings, and from "materials that were distributed at those meetings," when no allegations "specifically identify the reports or statements" made in connection with those meetings that would have contradicted the alleged misstatements. *Town of Davie Police Officers Retirement System* v.

_____

[4] CW1 and CW5 worked in "Client Success" jobs, but the complaint does not allege what, if any, line of reporting connected them to Gorevic, or how many levels removed they were. J.A. 42 ¶ 56 & n.5; *id.* 43, ¶ 60; *id.* 105, ¶ 212.

*City of North Miami Beach Police Officers' & Firefighters' Retirement Plan*, Civ. No. 21-909, 2021 WL 5142702, *2 (2d Cir. Nov. 5, 2021) (summary order) (citation omitted). Likewise allegations of "widespread" integration "issues," Br. 32 (citation omitted), are hardly incriminating; Teladoc was a telehealth company conducting an integration in the midst of a global pandemic, and Gorevic never represented that no "issues" occurred or that the integration was complete.[5]

*Third*, plaintiffs rely on another anecdote from CW4, Br. 33, "a Senior Leader" on the "clinical team," J.A. 28, ¶ 16. Plaintiffs allege that CW4 attended a leadership meeting in or around September 2021—months after the sales team statements were made—at which time CW4 asked Gorevic unspecified questions about "plans" for the integration, and he said "[w]ait until tomorrow." J.A. 209-210, ¶ 523. She interpreted this to suggest that unidentified integration issues "would finally be resolved" and that she "would [then] be satisfied." *Id.* But CW4 found Gorevic's presentation the next day "underwhelming" because it "added nothing new, provided very general information and no specifics," and "did not resolve" the unspecified integration issues she had raised the prior day. *Id.*

---

[5] Plaintiffs say that it "stands to reason," that CW1 and CW2 would remember only sales-related discussions because they worked in sales, Br. 31, but, applying that logic, they should recall the content of the statements they think would have indicated sales team integration was incomplete.

This anecdote is anachronistic and irrelevant. It is anachronistic because CW4's discussion with Gorevic took place months after the sales team statements were made, and cannot possibly inform his knowledge at the time of his statement. It is irrelevant because the complaint does not identify the subject of the "integration issues" that CW4 allegedly raised with Gorevic. *Id.* The simplest explanation to infer from that—and the fact that CW4 was a clinical team member, not a sales team member—is that CW4 was in no position to know information about sales team integration. Certainly, she does not allege that she conveyed any such information to Gorevic. *See Woolgar* v. *Kingstone Co., Inc.*, 477 F. Supp. 3d 193, 219 (S.D.N.Y. 2020) (declining to rely on a CW that lacked "specific experience with or knowledge" of the relevant subject and was not alleged "to have worked within the [relevant] side of the business"). And CW4's subjective disappointment about Gorevic's answer to her unspecified question adds nothing. *See City of Dearborn Heights Act 345 Police & Fire R* v. *Axonyx, Inc.*, 374 Fed. Appx. 83, 85 (2d Cir. 2010) (summary order) (the "opinions of confidential witnesses," without "any factual underpinnings," are not sufficient to allege recklessness).[6]

Finally, plaintiffs are wrong to suggest, Br. 30-31, that this Court has decided Gorevic's scienter, having concluded from CW allegations that the

___

[6] Plaintiffs add that an integrated sales team was important to the success of the integration, Br. 34-35, but that is unpersuasive as explained with respect to plaintiffs' "core operations" argument, *see* pp. 49-52, *infra*.

complaint adequately pled falsity for the sales team statements, J.A. 267-268 (referencing the allegations of CWs 2, 3, 5, and 7).[7] That conflates falsity with scienter. This Court has affirmed dismissals of complaints, including those based on CW allegations, that plead falsity but not scienter. *E.g.*, *In re Magnum Hunter Resources Corp. Securities Litigation*, 616 Fed. Appx. 442, 446 (2d Cir. 2015) (summary order) (concluding that CW allegations demonstrated "inadequate internal controls" in the abstract, but did not plead that any defendant knew of or disregarded the problem). Moreover, as between junior-level CWs and the CEO, the far stronger inference is that CWs are better positioned than the CEO to observe alleged incompleteness in sales team integration.

\* \* \* \* \*

Plaintiffs' remaining arguments largely rely on inapposite cases that, unlike here, involve CWs who identified contradictory internal information on the topic of a defendant's statement that was known by the defendant. *See Employees' Retirement System* v. *Blanford*, 794 F.3d 297, 306-308 (2d Cir. 2015) (relying, atop suspicious stock sales adequately pleading motive and opportunity, on allegations that CWs saw defendants hiding the inventory they

---

[7] CW7 is not alleged to have had any contact with Gorevic. On appeal, plaintiffs develop no argument that CW7's allegations demonstrate scienter as to Gorevic. *See* Br. 32 (citing, *inter alia*, the page of the complaint introducing CW7 and every other CW).

26

had stated was not accumulating in "excess"); *New Orleans Employees Retirement* v. *Celestica, Inc.*, 455 Fed. Appx. 10, 13-14 (2d Cir. 2011) (summary order) (relying on allegations of CWs who communicated directly with defendants, or "participated in meetings where they heard" others inform them, of information directly contradicting their misstatements). These cases, and the others plaintiffs cite,[8] stand in stark contrast to the alleged facts here.

Plaintiffs invoke this Court's decision in *In re Hain Celestial Group, Inc. Securities Litigation*, 20 F.4th 131 (2021) ("*Hain I*"). Br. 29. But neither that decision, nor this Court's review of the decision after remand, *Gimpel* v. *Hain Celestial Group, Inc. Securities Litigation*, --- F.4th ---, 2025 WL 2749562 (Sept. 29, 2025) ("*Hain II*"), supports plaintiffs. In *Hain I*, this Court concluded only that the district court had "failed . . . to assess the total weight

---

[8] *City of Warren Police & Fire Retirement System* v. *World Wrestling Entertainment Inc.*, 477 F. Supp. 3d 123, 131-132, 135-138 (S.D.N.Y. 2020) (relying on CWs that had been involved in the unproductive negotiations that the defendants later misleadingly described as reaching an "agreement in principle"); *Plumbers & Pipefitters National Pension Fund* v. *Orthofix International N.V.*, 89 F. Supp. 3d 602, 616-618 (S.D.N.Y. 2015) (relying on CWs that alleged the defendants participated in the improper revenue recognition scheme); *Freudenberg* v. *E\*Trade Financial Corp.*, 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010) (relying on numerous CWs that "had first-hand interactions with the Defendants concerning the matters alleged in the Complaint"); *In re Extreme Networks, Inc. Securities Litigation*, Civ. No. 15-04883, 2018 WL 1411129, at *27 (N.D. Cal. Mar. 21, 2018) (relying on a CW that "personally observed" the defendant admit that he knew contradictory information prior to his misstatement).

27

of the circumstantial allegations *together with* the allegations of motive and opportunity." 20 F.4th at 137-138. That did not happen here. The district court expressly performed a "holistic assessment," considering both motive and opportunity and circumstantial allegations. S.A. 30. And in *Hain II*, this Court found scienter based on CW allegations that the individual defendants personally received weekly reports on sales, inventory, and guidance targets (*i.e.*, forecasted financial-performance numbers); calculated shortfalls; and told managers to ship off-invoice products to distributors. 2025 WL 2749562, at *15. The CWs also allegedly heard defendants say they were "not supposed" to discuss channel-stuffing arrangements with the distributor, and "executives" told an employee to "stop asking questions" about end-of-quarter practices. *Id.* at *16. Again, no similar facts are alleged here.

Plaintiffs also generally criticize the district court as having required direct contact or direct evidence and giving insufficient weight to their circumstantial evidence. Br. 38-40. But the district court simply required plaintiffs to identify some facts by which Gorevic would have known that it was false to describe the sales teams as fully integrated—which is to say, the district court applied the standard for pleading scienter that this Court has articulated time and again. *E.g.*, *Arkansas Public Employees' Retirement System* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022).

28

### ii.    *Knowledge Of Subordinates*

Plaintiffs next invoke the purported knowledge of Gorevic's subordinates, David Sides, chief operating officer, and Joe DeVivo, president of Teladoc's Hospital & Health Systems division, to plead Gorevic's scienter.  Br. 41-44.  But the knowledge of subordinates cannot be imputed to a supervisor based on "the corporate hierarchy" or the "existence of channels of information."  *Local No. 38 International Brotherhood of Electrical Workers Pension Fund* v. *American Express Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010) (citation and alteration omitted).  Here, the complaint alleges no facts demonstrating Sides or Joe DeVivo told Gorevic that the sales teams were not "fully integrated."

Plaintiffs assert, Br. 41, that Sides "admitted that there was no integration plan during the June 2021 meeting."  That is not what the complaint says.  What the complaint actually says is that CW2 asked Sides "what the plan was to integrate RPM," referring to remote patient monitoring; that Sides responded either "I don't know" or "That's a great question"; and that Sides' response "worried" CW2.  J.A. 77 ¶ 144 (emphasis omitted).  CW2's question was not about sales teams; RPM is a product, not a team.  In any event, those allegations post-date the sales team statements, and offer no facts about what Sides communicated to Gorevic.  *Fadem* v. *Ford Motor Co.*, 352 F. Supp. 2d

501, 502 (S.D.N.Y. 2005) (explaining that plaintiffs needed to show "what information was actually passed through [those] channels" and "what information, if any, was conveyed to" the CEO and CFO).

Plaintiffs also allege that, during meetings, DeVivo "provided more details about the difficulties the [c]ompany faced regarding integration." J.A. 207, ¶ 516. Likewise, plaintiffs do not plead what, if anything, DeVivo conveyed to Gorevic regarding integration "difficulties." *Id.*; *see Fadem*, 352 F. Supp. 2d at 502. Plaintiffs also cite, Br. 42-43, an "Open Issues" document that CW2 drafted with a colleague, proposing a corrective strategy to "their management, which included Bruce Brandes, Rob Fithian, and Gerry Marini," not parties to this litigation, that also was "intended for 'Joe DeVivo,'" J.A. 89, ¶ 173. Allegedly prepared between November 2020 and January 2021, the memo includes a list of questions about the responsibilities and goals of former Livongo sales employees that had been assigned to Teladoc's Hospital & Health Systems division—for instance, what to sell, who their clients were, how compensation would work, and how they would work with other divisions and teams. J.A. 89-91, ¶ 174. The complaint alleges no facts showing that DeVivo even received the document, much less whether or when he conveyed to Gorevic any facts about sales team integration.

To support relying on the purported knowledge of Gorevic's subordinates, plaintiffs cite three decisions. Br. 41. Yet in each of those decisions, the

subordinate was alleged to have actually shared inconsistent facts with the defendant. In *In re Turquoise Hill Resources Ltd. Securities Litigation*, 625 F. Supp. 3d 164 (S.D.N.Y. 2022), the defendant allegedly misstated that a project was "on plan and on budget," even though an expert had told the defendant—and in more detail, the defendant's direct report, who responded that she would tell the defendant "again"—that the project was behind and over budget, *id.* at 185-190, 243-246. In *Galestan* v. *OneMain Holdings, Inc.*, 348 F. Supp. 3d 282 (S.D.N.Y. 2018), defendants themselves received data showing post-merger decreases in productivity and difficulties in originating loans, in contradiction to their public statements, *id.* at 300-301. And in *Weston* v. *DocuSign, Inc.*, 669 F. Supp. 3d 849 (N.D. Cal. 2023), defendant's direct report allegedly presented to him "a roll-up" showing that customer demand was significantly declining, inconsistent with the defendant's later statement, *id.* at 884-885. Unlike these cases, the complaint here alleges no facts to support an inference that, whatever Gorevic's subordinates knew, they conveyed any information to Gorevic that contradicted his statements.

### iii.    *Specificity*

Plaintiffs also contend that Gorevic's sales team statements were so specific as to independently "support an inference that Gorevic was knowledgeable about the specific matter on which he publicly spoke, including adverse facts contradicting his misstatements." Br. 44. But plaintiffs' cases credit this

argument where the statement itself suggested that the speaker must have received *inconsistent* information. In *City of Pontiac General Employees' Retirement System* v. *Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012), the statement itself communicated the source of the contrary information because it referenced a specific division's "solid backlog," which could only have been learned from another executive who personally tampered with the backlog numbers, *id*. at 363, 370-372. That reasoning is inapposite here; the sales team statements themselves do not inherently suggest that Gorevic knowingly received false information. *See In re Chembio Diagnostics, Inc. Securities Litigation*, 586 F. Supp. 3d 199, 222 n.10 (E.D.N.Y. 2022) (emphasizing that the specificity of the statements in *Lockheed Martin* was secondary to well-pleaded allegations that the information had come from a co-defendant that acted with scienter).

Likewise, in *In re Virtu Financial, Inc. Securities Litigation*, 770 F. Supp. 3d 482 (E.D.N.Y. 2025), the court assumed that executives had received certain information because it had been reported to the SEC, *id*. at 523-524. And plaintiffs' other case features a CW who directly alleged that the defendants possessed the contradictory information. *See Gauquie* v. *Albany Molecular Research, Inc.*, Civ. No. 14-6637, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016).

Plaintiffs further point to the *Business Insider* article as an "admission" that "contribute[s] to Gorevic's scienter." Br. 46. But the alleged admission came from an unidentified "spokesperson" not Gorevic, and, in any event, did not address sales team integration. The *Business Insider* article instead reported that the Teladoc and Livongo sales teams had been required to combine earlier that year—consistent with Gorevic's statements. *See* J.A. 1093.

### iv. *Magnitude*

Plaintiffs also argue, Br. 46-47, that the "magnitude" of the falsity demonstrates scienter, pointing to the goodwill impairments of $6.6 and $3 billion, J.A. 37, ¶¶ 40-41. This argument fails for two reasons. *First*, the goodwill impairments were precipitated by Teladoc's decline in value due to increased competition and deterioration in the mental health and chronic care businesses. J.A. 187-189, ¶¶ 453-456. These allegations may have been relevant to Plaintiffs' now-abandoned competition theory, but are irrelevant to plaintiffs' operative theory, based on statements about integration.

*Second*, even if relevant, the "magnitude" of the writedowns does not establish scienter. This Court rejected a similar argument in *New England Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*, 122 F.4th 28 (2023), where the company had restated five years' worth of financial statements to correct income and earnings figures that "had been significantly overstated"—by up to 23% one year, *id.* at 38 & n.5, 49. The Court explained

that the "magnitude" and "duration" of those misstatements failed to demonstrate an extreme departure from the standards of ordinary care. *Id.* at 49.

Plaintiffs cite cases that, unlike here, connect the scale of the misstatement to the defendant's state of mind.[9] By contrast, here, plaintiffs claim that Gorevic overstated the completion of one aspect of an ongoing integration effort, with no accompanying financial restatement. There is no "magnitude" to support scienter on these facts.

### b. 10-K Statement

Plaintiffs also argue that Gorevic was reckless because his signature appears on the February 2022 10-K, which contained the allegedly false risk disclosure. The complaint does not offer any allegations that Gorevic (or anyone else) inserted the allegedly false 10-K risk disclosure with intent to defraud shareholders. Nor could it; the identical risk disclosure appeared in the 10-K for the prior year, before integration risks allegedly materialized. (This Court dismissed the claim premised on the 2020 10-K risk disclosure on that basis.

---

[9] In *Gauquie*, the misrepresentation was touting the value of an acquired facility with a known contamination that "accounted for 40-50%" of the facility's sales. 2016 WL 4007591, at *1, 3. In *In re Salix Pharmaceuticals, Ltd.*, Civ. No. 14-8925, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016), actual inventory was three times the reported value, alleged to be a "crucial metric[]" for the company's overall financial status and "resulted in a $500 million diminution in revenue," *id.* at *16. In *City of Hollywood Police Officers' Retirement System* v. *Henry Schein, Inc.*, 552 F. Supp. 3d 406 (E.D.N.Y. 2021), the defendant had a "significant financial stake in the transaction—far beyond that of an ordinary corporate official," *id.* at 416.

J.A. 266 & n.3.) The source of recklessness, therefore, can only be the failure to modify the language from the prior 10-K to reflect that "potential" risks had already materialized, causing Teladoc "difficulties" as of February 2022. J.A. 176, ¶ 409.

Plaintiffs accuse the district court of "second-guessing this Court" and "rehash[ing]" falsity arguments settled during the previous appeal. *See* Br. 49-50 & n.6; *see also* Br. 4-5, 17. But the district court correctly recognized that scienter cannot be properly evaluated, under this Court's precedents, without identifying which risks allegedly materialized and were known to the individual defendants. *See* S.A. 21-25 (citing J.A. 263, *Set Capital LLC* v. *Credit Suisse Group AG*, 996 F.3d 64 (2d Cir. 2021), and *Meyer* v. *Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014)). The district court thus carefully considered, defendant by defendant, what information each allegedly knew about specific materialized risks relating to sales team, Tableau, and Salesforce integration.

(1) As explained above, pp. 20-34, the complaint does not plead facts supporting Gorevic's knowledge concerning sales team integration. Therefore, the complaint does not plead Gorevic's scienter for any 10-K risk disclosure based on the same theory. And plaintiffs do not argue on appeal that Gorevic knew about delayed Tableau integration or Salesforce issues; nor can they, as

35

the district court correctly concluded, S.A. 26-27, the complaint alleges no facts connecting Gorevic with Tableau or Salesforce in any way.

(2) Plaintiffs now argue that materialized product risks were also misrepresented by Gorevic in the 10-K risk disclosure. Br. 49. But plaintiffs forfeited this argument by failing to assert it in the district court.[10] In any event, plaintiffs do not identify a product integration risk that had materialized and was causing "difficulties" to Teladoc's business in February 2022—much less one that was known to Gorevic. Plaintiffs cite CW2's personal discomfort in late 2020 with pitching clients for as-yet-undeveloped products, and sales team confusion in 2021 over RPM capabilities. Br. 48-49 (citing J.A. 72-81, ¶¶ 132-150). But those allegations are not contemporaneous and do not even concern product integration, much less identify a materialized product integration problem known to Gorevic. Plaintiffs also cite that a beta version of a "whole person solution" rolled out in January 2022, and that Livongo's glucometer was not accessible to doctors as of fall 2021. Br. 49 (citing J.A. 72, ¶ 132). But, again, the timing of particular product rollouts is irrelevant absent allegations

---

[10] Plaintiffs did not develop that argument before the district court; they referenced product integration problems once in their loss-causation argument, J.A. 1252-1253; once in the factual background, J.A. 1234; and once in advancing an argument that "subsequent admissions" about product integration demonstrate Gorevic's scienter, J.A. 1242. The Court need not evaluate this argument in the first instance. *See*, *e.g.*, *Gross* v. *Rell*, 585 F.3d 72, 95 (2d Cir. 2009) (citation omitted).

that a product integration problem had materialized and was known to Gorevic. Finally, plaintiffs cite Gorevic's so-called "admission" in April 2022 that product integration was "not finished." Br. 48. But, Teladoc and Gorevic had repeatedly disclosed that product integration was ongoing, pp. 6-9, *supra*, this "admission" does not say, as plaintiffs contend, that product integration was harming Teladoc's business (*i.e.* had materialized) in February 2022.

*　　*　　*　　*　　*

In sum, the facts alleged in the complaint do not demonstrate scienter as to Gorevic on a recklessness theory.

### 2. *Verstraete*

Plaintiffs also have not pleaded scienter under a recklessness theory as to Verstraete for her marketing data integration statement, which is allegedly false because—according to CW11, a data-analytics employee—a single application, Tableau, was not yet integrated. *See* J.A. 268.

The district court assessed all relevant CW allegations, and found "nothing" in the complaint "that would alert [Verstraete] that the integration of Tableau was incomplete." S.A. 19. Plaintiffs now argue that the district court should have given more weight to the allegations of CW11, CW3, and CW8. Br. 57-58 & n.7. But those CWs are not "in a position to speak to [Verstraete's] state of mind" by directly having communicated with her, or otherwise. *See City of Omaha*, 450 F. Supp. 3d at 423:

37

- CW11 was a data analytics employee who departed months before the statement, was not in Verstraete's reporting line, and most importantly, does not claim to have communicated with Verstraete. J.A. 45, ¶ 66.

- CW3 offers nothing about Tableau, offering only that Verstraete "discussed increased competition at quarterly and monthly all-hands meetings attended." Br. 58 (quoting J.A. 111, ¶ 226). The competitive environment is irrelevant to Tableau integration.

- CW8 fares no better. She worked three levels below Verstraete, J.A. 44, ¶ 63, and "felt" that "Verstraete did not understand enough about Livongo or the product," J.A. 171, ¶ 394. That subjective feeling is irrelevant to Verstrate's knowledge of the integration status of Tableau. *See City of Omaha*, 450 F. Supp. 3d at 422-423 (rejecting allegation of CW that thought a defendant's growth estimate was "curious and unrealistic").

Plaintiffs also argue that the "specificity of Verstraete's misstatement supports scienter." Br. 55. Plaintiffs again rely on *Lockheed Martin*, Br. 56, but there is nothing about Verstraete's alleged misstatement that inherently suggests her knowledge of Tableau. *See* p. 32, *supra*. Likewise plaintiffs are mistaken that the "magnitude of the falsity" demonstrates scienter, Br. 56-57, both for the reasons explained above, pp. 33-34, and because the complaint

does not plead that Tableau's integration has any "magnitude" to the integration generally or Teladoc overall.

In sum, neither specificity nor magnitude supports an inference of scienter as to Verstraete, and the CW allegations "do not supply what specific contradictory information was available to" her at that time. *See In re AppHarvest Securities Litigation*, 684 F. Supp. 3d 201, 242 (S.D.N.Y. 2023).

### 3. *Murthy*

The complaint alleges no facts supporting a strong inference that Murthy acted with scienter as to the 10-K statement, on which her signature appears.

Plaintiffs argue that Murthy "admit[ed]" the falsity of the 10-K statement by noting in July 2022 that the "integration of our data that underpins bringing together all of our suite of products . . . still continues." Br. 53 (quoting J.A. 196, ¶ 480). But Murthy simply acknowledged that product integration continues, which was repeatedly disclosed and never in doubt. This so-called "admission" says nothing about Murthy's knowledge of potential risks that had allegedly materialized as of February 2022.

Plaintiffs also assert that CW3 attended meetings during which Murthy discussed "increased competition," which plaintiffs argue "demonstrates Murthy's knowledge of integration problems." Br. 54 (citing, *e.g.*, J.A. 111, ¶¶ 226-227). The cited allegations, however, simply describe instances where

CVS (a Teladoc competitor) "tried to flip" clients by "leveraging" unspecified "integration issues" at Teladoc.  J.A. 109, ¶ 222.  This anecdote tells us nothing about what integration issues were discussed, what Murthy was told about them, or when she purportedly acquired relevant knowledge.  And allegations about external competition inherently say nothing about Murthy's contemporaneous internal integration-related knowledge.  Finally, as explained, pp. 33-34, *supra*, the supposed "magnitude" of the 10-K statement cannot alone support scienter, and plaintiffs offer no quantification of its supposed "magnitude" anyway.  *See In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326, 366 (S.D.N.Y. 2011).

### 4. *Napolitano*

As to Napolitano, plaintiffs argue that "the district court all-but ignored the facts and allegations establishing . . . Napolitano's scienter." Br. 52, 54.  Plaintiffs do not identify those facts or allegations, however.  They rely instead on the "magnitude" of the 10-K statement, Br. 52, which does not support scienter, *supra* pp. 33-34.

### B.  Plaintiffs Do Not Plead Facts Supporting Motive And Opportunity To Defraud

To plead scienter by motive and opportunity to commit fraud, a plaintiff must allege facts showing that defendants "benefitted in a concrete and personal way from the purported fraud."  *Novak*, 216 F.3d at 311.  "[T]he desire

40

to keep stock prices high to increase officer compensation" does not "constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307). For that reason, plaintiffs cannot rest on allegations that an insider defendant's stock sales generated "significant net profits"; instead, trading must be "unusual," when considering profits, sales over time, and activity in the issuer's stock as a proportion of total portfolio activity. *See Arkansas Public Employees*, 28 F.4th at 355-356 (quoting *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 74 (2d Cir. 2001)). And this Court has identified certain circumstances that indicate ordinary, rather than unusual, trading—when the portion of portfolio activity involving issuer stock was consistent before and after the class period; when purchases exceeded sales of issuer stock; and when sales decisions were delegated by defendants to third parties under a 10b5-1 trading plan. *See id.* at 355.

Applying those principles, the district court correctly concluded that the complaint's allegations do not demonstrate motive and opportunity to commit fraud for any defendant. S.A. 13, 27-30. Because defendants increased their holdings of Teladoc stock over the class period, these trades "raise[] precisely the contrary inference from the one suggested by plaintiffs." *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011); *see also Tung* v. *Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 459-460 (S.D.N.Y. 2019) ("The fact that the Defendants *increased* their stock holdings during the Class Period is wholly

41

inconsistent with fraudulent intent.") (internal quotation marks, citation, and brackets omitted).

### 1. Gorevic

As the district court determined, *see* S.A. 27-30, the complaint does not permit an inference of motive and opportunity as to Gorevic based on stock sales: Gorevic increased his overall holdings by 7.5% over the relevant period, J.A. 945-1013, which shows "only confidence in the future of [the] company," *Avon Pension Fund* v. *GlaxoSmith Kline PLC*, 343 Fed. Appx. 671, 673 (2d Cir. 2009) (summary order), and is "wholly inconsistent with fraudulent intent," *In re Bristol-Myers Squibb Securities Litigation*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004). Further, there is nothing suspicious or unusual about the timing of Gorevic's sales, and 22 of Gorevic's 26 sales (excluding gifts) were pursuant to a 10b5-1 plan, J.A. 307—sales that, "as a general matter, do not give rise to a strong inference of scienter." *In re DraftKings Inc. Securities Litigation*, 650 F. Supp. 3d 120, 176 (S.D.N.Y. 2023) (internal quotation marks and citation omitted). The remaining trades were made to satisfy tax obligations, and "disposition of shares to pay taxes do not demonstrate a defendant's motive to defraud." *North Collier Fire Control & Rescue District Firefighter Pension Plan* v. *MDC Partners, Inc.*, Civ. No. 15-6034, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016).

a.     Plaintiffs rely heavily on the volume and proceeds of Gorevic's sales: 150,000 shares for proceeds of almost $30 million.  Br. 65-69; J.A. 211-212, ¶ 531.  But this Court has repeatedly rejected the argument that sales are "unusual" based on volume or proceeds alone.  For instance, in *Arkansas Public Employees*, the Court identified no "unusual" trading activity as to sales involving 939,966 shares and $55 million in profits.  *See* 28 F.4th at 351, 355-356; Br. of Appellee 46, Dkt. 69, No. 20-3716 (2d Cir. May 6, 2021); *cf. Rothman* v. *Gregor*, 220 F.3d 81, 94-95 (2d Cir. 2000) (describing profits of $20 million as not "unusual").

Plaintiffs cite *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999), and *In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003), for the proposition that the volume of Gorevic's sales was "significantly higher than what courts consider unusual."  Br. 66.  But those cases focused on the timing of trades—in advance of a negative public announcement, *see Oxford*, 187 F.R.D. at 139-140, or "within a short period of time after [an] IPO," *In re Initial Public Offering*, 241 F. Supp. 2d at 372.  No such facts are pleaded here.  Plaintiffs do not plead facts showing that any sales were temporally linked to the alleged misstatements or corrective disclosures.  Absent such allegations, Gorevic's stock sales do not "give rise to an inference of insider knowledge, at the time of the sales, of material undisclosed bad news."  *See In re Aratana Therapeutics Inc. Securities Litigation*, 315 F.

43

Supp. 3d 737, 763-764 (S.D.N.Y. 2018); *see also In re Take-Two Interactive Securities Litigation*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008).

b. Plaintiffs acknowledge that Gorevic sold fewer shares during the class period than during the control period, J.A. 215, ¶ 540 n.42, but invite the Court to disregard the larger control period sales because of an alleged "pandemic-driven surge in Teladoc stock price," Br. 66 & n.8. That makes no sense. The purpose of the control period is to evaluate whether the *quantity* of shares sold during the class period follows from an earlier pattern. That the stock increased in value during the class period from the pandemic tells us nothing about the long-term pattern of Gorevic's trading. Unsurprisingly, plaintiffs identify no authority to support the proposition that the Court should disregard the control period sales. *See* Br. 66 & n.8. And ignoring the control period would be inconsistent with a court's affirmative obligation to examine inferences that do not favor plaintiffs. *See Tellabs*, 551 U.S. at 323.

c. Plaintiffs also dismiss the overall 7.5% increase in Gorevic's holdings, Br. 67, relying on a statement in *Freudenberg*, a decision observing that an insider may purchase stock and plan to sell it profitably later, believing the fraud will be resolved or remain hidden, *see* 712 F. Supp. 2d at 201. But in the relevant passage, the *Freudenberg* court was rejecting the defendant's argument that his overall increase in holdings could disprove scienter where CW

44

allegations showed that the defendant knew facts inconsistent with his statements. *Id.* at 196-197, 201. In any event, *Freudenberg* does not contradict the well-established law in this Circuit that trading must be suspicious in timing and amount taking into account prior patterns.[11]

      d.     Plaintiffs further point to the sales of other corporate insiders. *See* Br. 68-69. That does not move the needle because sales by non-party insiders do not support scienter for Gorevic (or any individual defendant). *See In re Piedmont Lithium Inc. Securities Litigation*, 712 F. Supp. 3d 301, 312-313 & n.2 (E.D.N.Y. 2024).[12] In any event, as the district court correctly concluded,

---

[11] Plaintiffs cite *Dolgow* v. *Anderson*, 438 F.2d 825, 826-828 (2d Cir. 1970), for the proposition that only open-market purchases—rather than shares acquired due to vesting stock options—are probative. It appears that no court has cited *Dolgow* for that proposition. And the opposite is true. *See In re eSpeed, Inc. Securities Litigation*, 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) (explaining that "stock options . . . must be considered along with shares actually held in determining whether insider sales are significant" when determining if a defendant increased their holdings during the class period); *see also In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999). What is more, *Dolgow,* which pre-dates the PSLRA, analyzed allegations that class-period stock sales were unusual compared to prior periods, which is not the case here. 438 F.3d at 826-828. To the contrary, here, Gorevic's overall holdings *decreased* during the control period, which he ended by owning 126,736 fewer shares than he owned at the start, but *increased* during the class period by 39,276 shares. J.A. 945-1013. In all events, this Court's controlling precedents require plaintiffs to identify class period sales that are suspicious, taking into account total holdings. *See Arkansas Public Employees*, 28 F.4th at 351, 355-356.

[12] Plaintiffs cite *In re SLM Corp. Securities Litigation*, 740 F. Supp. 2d 542 (S.D.N.Y. 2010) and *Van Dongen* v. *CNinsure Inc.*, 951 F. Supp. 2d 457 (S.D.N.Y. 2013), but neither helps them. The *SLM* decision analyzed no non-

both Tullman (Livongo's departing founder) and Sides (Teladoc's COO) made their "sales shortly before their departures from Teladoc in 2021," and the complaint "does not explain why it would be considered suspicious for departing executives to divest their shares." S.A. 30; *see also City of Taylor General Employees Retirement System* v. *Magna International Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013).

      e.      Finally, plaintiffs argue that Rule 10b5-1 plans provide only an affirmative defense, Br. 68, but this Court has previously held that such sales pursuant to pre-set trading plans are not suspicious absent allegations that, for instance, a plan was entered with a wrongful purpose, *see Arkansas Public Employees*, 28 F.4th at 355-356. No alleged facts suggest such circumstances here.

### 2. *Verstraete*

      Plaintiffs' arguments regarding Verstraete's motive and opportunity are no more persuasive than those regarding Gorevic. The district court correctly concluded that Verstraete's stock sales were not unusual or suspicious. S.A. 28. Verstraete increased her stock holdings during the class period by 140%, from 13,276 shares to 31,828 shares, J.A. 312, 1035-1088. And, as compared to the control period (in which Verstraete added a net total of 7,924

---

party insider sales, 740 F. Supp. 2d at 557-559, and the *Von Dongen* decision grounded scienter in suspiciously timed defendant sales, treating the non-party insider sales as auxiliary, 951 F. Supp. 2d at 475.

shares), Verstraete increased her class-period holdings by even more (18,552 shares). J.A. 312, 1035-1088. Moreover, the complaint admits that Verstraete made "larger sales in the Control Period" than during the class period. J.A. 215, ¶ 540 n.42. And all of Verstraete's sales were either pursuant to a 10b5-1 plan or for tax purposes. J.A. 312, 1035-1088. Verstraete's stock activity thus raises "precisely the contrary inference from the one suggested by plaintiffs." *Glaser*, 772 F. Supp. 2d at 593.

a. Plaintiffs argue that Verstraete "reap[ed] over $4 million in proceeds." Br. 65. But proceeds alone are not informative, and this Court has found proceeds far larger than $4 million not suspicious. *See* p 43, *supra* (citing cases).

b. Plaintiffs note that five of Verstraete's eight class-period sales were not pursuant to a Rule 10b5-1 plan. But plaintiffs identify nothing suspicious about these particular sales, all of which were made to cover tax obligations. *See* pp. 42-43, *supra* (citing cases).

c. Plaintiffs point out that one of the three Rule 10b5-1 plan sales followed Verstraete's entry into a new plan, adopted on August 6, 2021. Br. 68. But Verstraete adopted this plan before her one alleged false statement, the November 18, 2021 marketing data statement, J.A. 170, ¶ 392, and thus delegated trading authority under the plan before she allegedly inflated the stock price. *See In re Lululemon Securities Litigation*, 14 F. Supp. 3d 553,

585 (S.D.N.Y. 2014) (plan entered into during class period still a defense where the complaint "pleads no facts that even remotely suggest that [the executive] entered into the [p]lan 'strategically' so as to capitalize on insider knowledge of the company's allegedly undisclosed quality control issues").

### 3. *Murthy*

Finally, plaintiffs' allegations do not establish motive and opportunity as to Murthy for the same reasons discussed with respect to Gorevic and Verstraete. Murthy increased her overall Teladoc holdings during the class period, gaining a net total of 18,211 shares and increasing her holdings by 200%. J.A. 310, 1015-1033. And while plaintiffs argue that Murthy traded without a 10b5-1 plan and made more sales during the class period than in the control period, Br. 66-67, they ignore that all sales were made to cover tax withholding obligations, J.A. 310, which, as previously noted, pp. 42-43, *supra* (citing cases), are not indicative of fraud. In any event, plaintiffs identify no suspicious trades near the time of Murthy's one alleged misstatement, the 10-K risk disclosure.

*    *    *    *    *

In conclusion, plaintiffs fail to allege facts supporting a strong inference that any defendant had the motive and opportunity to commit fraud. *See Arkansas Public Employees*, 28 F.4th at 355-356; *see also ECA*, 553 F.3d at 200-

48

201. If anything, given that defendants overall increased their holdings, these allegations support the opposite inference.

### C. The "Core Operations" Doctrine Does Not Support Scienter

Plaintiffs also invoke the "core operations" theory. *See* Br. 58-64. "The core-operations doctrine posits that 'scienter may be imputed to key officers who should have known facts relating to the "core operations" of their company.'" *Hain II*, 2025 WL 2749562, at *16 n.19 (quoting *Wachovia*, 753 F. Supp. 2d at 352). The Second Circuit has not directly addressed whether the core operations doctrine survived the passage of the PSLRA, though it has assumed the doctrine may "provide supplemental support for allegations of scienter." *Id.* (quoting *Celestica, Inc.*, 455 Fed. Appx. at 14 n.3). The doctrine, as courts have observed, does not easily reconcile with the PSLRA's fundamental enterprise of requiring scienter to be pleaded with particularity. *See, e.g.*, *Wachovia*, 753 F. Supp. 2d at 353.

Even assuming the doctrine survives in supplementary form, there is nothing to supplement here. *See* pp. 19-49, *supra*; *see also In re Diebold Nixdorf, Inc., Securities Litigation*, Civ. No. 19-6180, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021) ("[T]he core operations doctrine can only be a buoy, not a life raft.").

And even assuming there were anything to supplement, the integration here was not a "core operation" of Teladoc's business. Plaintiffs contend that

49

the "size of the [Livongo] acquisition alone" rendered integration a core operation. Br. 59, 61. But the "core operations" theory goes to inferred knowledge of the allegedly misstated information because it was core to the Company's financial performance. *See, e.g., Cosmas* v. *Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989). Here, Teladoc's core business is providing healthcare; the alleged misstatements concern the integration of another company in a one-of-a-kind corporate transaction. *See City of Omaha*, 450 F. Supp. 3d 423-424.

But even assuming in principle that integration can be a "core operation," the alleged misstatements here still do not concern core operations. Plaintiffs argue that integration *as a whole* was a core operation, *see* Br. 61, but tellingly do not suggest that routine integration of a software program or incomplete sales team integration—the allegedly misrepresented facts—constituted "core operations" of Teladoc. Elsewhere plaintiffs assert that the district court "refused to apply" the doctrine, Br. 18; to the contrary, the district court explained that the facts alleged do not show "that the more specific subjects that are the basis of the misrepresentations that remain at issue in this case, such as sales team and Tableau integration, were so central to the integration process that knowledge of them can be inferred." S.A. 27. Plaintiffs cite no authority for the proposition that the general importance of an acquisition to a company suffices to allege that the integration of specific business team or software application constitutes a core operation. In fact, a case they

50

cite says the opposite. *See Extreme Networks*, 2018 WL 1411129, at *29 (explaining that knowledge of the acquisition and the importance of integrating the companies "does not amount to knowledge of the minutia of all integration efforts thereafter").

Plaintiffs cite core operations cases, Br. 59-64, with little if any resemblance to this case. In particular, *Hawaii Structural Ironworkers Pension Trust Fund* v. *AMC Entertainment Holdings, Inc.*, 422 F. Supp. 3d 821 (S.D.N.Y. 2019), reasoned that the acquisition and renovation of theaters could be a core operation of a theater company, but cautioned that, "on its own, [was] insufficient to allege a strong inference of scienter," *id.* at 852. And the decision in *In re Hi-Crush Partners L.P. Securities Litigation*, Civ. No. 12-8557, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013), hinged on defendants' presumed knowledge that a deal projected to generate 18% of the company's annual revenue had been repudiated, *id.* at *26. Plaintiffs' other cases are similarly inapposite.[13]

---

[13] *In re Avon Securities Litigation*, Civ. No. 19-01420, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019), turned on the defendants' presumed knowledge that sales representatives in the company's single largest market (which generated 21% of the company's revenue) had not been trained at all, despite numerous trips by the defendants to that market, *id.* at *20. Finally, *Buxbaum* v. *Deutsche Bank A.G.*, Civ. No. 98-8460, 2000 WL 33912712 (S.D.N.Y. Mar. 7, 2000), relied on the defendant's "personal[] involve[ment]" in takeover talks, in the context of alleged misstatements that included his own *denials* that such talks had occurred, *id.* at *19. Plaintiffs also cite *World Wrestling Entertainment Inc.*, 477 F. Supp. 3d at 138, and *Nursing Home Pension Fund, Local*

In short, the "core operations" doctrine—even if it survived the PSLRA and applies here at all—does not support a strong inference of scienter.

### D. Plaintiffs Do Not Plead Facts Supporting Corporate Scienter By Way Of Non-Defendant Employees

Corporate scienter requires "pleading facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (internal quotation marks and citation omitted). That is simplest when the scienter of an individual defendant that "made the challenged misstatement" can be imputed to the company. *Id.* Short of that, scienter can be imputed from non-speaker "officers or directors" that "were involved in the dissemination of the fraud." *Id.* (citing *Loreley*, 797 F.3d at 177). That standard is not met here because the complaint alleges no facts to justify imputing the scienter of any non-defendant, non-speaker to the corporation.

Plaintiffs look to non-defendants Sides, DeVivo, and Shah. Br. 70-72. But the complaint "contains no specific factual allegations that create an inference, let alone a strong one," that any of these individuals had the requisite fraudulent intent that could then be imputed to any defendant. *See Rex & Roberta Ling Living Trust* v. *B Communications Ltd.*, 346 F. Supp. 3d 389,

---

*144* v. *Oracle Corp.*, 380 F.3d 1226, 1228 (9th Cir. 2004), but neither discusses the core operations doctrine.

407 (S.D.N.Y. 2018); *see also Jackson*, 960 F.3d at 99 (requiring non-defendant "employees themselves [to] possess scienter" for theory to apply).

Plaintiffs invoke *Loreley*, which is inapposite: there, two high-level employees personally injected false information into offering documents. *See* 797 F.3d at 177-178. Here, Sides, DeVivo, and Shah are not even linked to the dissemination of any alleged misstatements. *See Jackson*, 960 F.3d at 99. No such link can be assumed merely because Sides, DeVivo, and Shah held high-level positions. Nor did the *Rex & Roberta* court hold otherwise, as plaintiffs suggest. *See* Br. 71-72. Instead, that court made clear that plaintiffs must plead both that the non-defendant employee had "knowledge of the facts" and occupied a position with "some oversight over the company's public-facing representations." *Rex & Roberta*, 346 F. Supp. 3d at 409-410. That is not alleged here.

Plaintiffs are also wrong, Br. 70-72, that Sides, DeVivo, and Shah were alleged to be "aware of" sales team integration issues. *First*, plaintiffs cite CW2's allegation that she asked Sides about integration during a meeting, and he did not know the answer, which "worried" her. *See* J.A. 77, ¶ 144. But CW2 equivocates between alleging that the question concerned "the plan to integrate RPM" and "the plan to integrate Livongo" generally, but neither of those topics concerns the integration status of sales teams. *Id. Second*, plain-

tiffs cite CW2's allegation that DeVivo "provided more details about the difficulties the [c]ompany faced regarding integration" during "department team meetings." J.A. 207, ¶ 516. But plaintiffs do not allege who, what, when, or how any relevant information was conveyed to DeVivo. *Third*, plaintiffs cite CW2's allegation concerning an "Open Issues" document she drafted. J.A. 88-91, 209, ¶¶ 173-175, 522. The complaint alleges that this document was "intended" for certain non-defendants among Teladoc "management," and that CW2 and her colleagues "used these notes as 'talking points' with management, such as Joe DeVivo, when discussing their concerns." J.A. 89, ¶ 173. Those allegations do not demonstrate what was conveyed to whom or that anyone in "management" ever received the document itself, let alone when, whether, or how they responded. *Id. Finally*, plaintiffs point to allegations that DeVivo and Shah made public statements about the integration, J.A. 134, ¶ 297, but that tells us nothing about their internal knowledge or control over statements made by others. These allegations simply fail to demonstrate any "connective tissue" between Sides, DeVivo, or Shah and "the alleged misstatements." *See Jackson*, 960 F.3d at 99.

In sum, the district court correctly concluded that because "Sides, DeVivo, and Shah are not alleged to have acted with fraudulent intent, they did not make the statements at issue, [and] they are not alleged to have been

'involved in the dissemination of the fraud,'" plaintiffs failed to plead corporate scienter. S.A. 17 n.4 (quoting *Jackson*, 960 F.3d at 98-99).

*     *     *     *     *

For these reasons, *see* pp. 19-55, *supra*, weighed separately and holistically, the alleged facts fail to plead a strong inference of scienter. The far more compelling inference is that defendants—who consistently told shareholders that integration was challenging and ongoing, and increased their own holdings of Teladoc stock—were not aware of allegedly incomplete sales team integration and Tableau integration, which the CWs were better positioned to observe. And, having failed to plead primary liability or culpable participation, the complaint also fails to plead Section 20(a) control person liability. *See Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

## II.  THE COMPLAINT DOES NOT PLEAD LOSS CAUSATION

Should the Court disagree with the district court's ruling on scienter, for the sake of judicial efficiency, defendants request that the Court affirm on the alternative ground that the complaint does not plead loss causation. This case has already resulted in two appeals, the loss causation analysis is straightforward, and plaintiffs do not dispute the Court's authority to decide it. *See* Br. 74.

Loss causation can be established by allegations "that the market reacted negatively to a corrective disclosure of the fraud." *In re Omnicom*

55

*Group, Inc. Securities Litigation*, 597 F.3d 501, 511 (2d Cir. 2010). To be "corrective," a disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *Id.*

None of the three alleged corrective disclosures reveals the falsity of any of the four remaining alleged misrepresentations.

*First*, plaintiffs proffer as a corrective disclosure the November 10, 2021 *Business Insider* article, which reports various integration-related challenges that Teladoc had experienced, and cited a Teladoc "spokesperson" who acknowledged that "integration was an issue" in the first six months. J.A. 1090-1100 (full article). That article predates Verstraete's November 18, 2021 statement about marketing data integration, and the February 2022 10-K risk disclosure. As plaintiffs acknowledge, *see* Br. 76, this article thus can serve as a "correction" of only the earlier sales team statements from February and April of 2021, *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (a corrective disclosure must "reveal to the market the falsity of the *prior* [statements]") (emphasis added).

The *Business Insider* article does not correct Gorevic's prior statements that sales teams were fully integrated. To the contrary, the article says that the sales teams had to "fully combine" in January 2021. J.A. 1093 ("The department in charge of client operations, for example, had to fully combine with

Livongo's by January 1, a former employee said."); *see also* J.A. 1092 (describing Teladoc as having "quickly brought" the Livongo team "into Teladoc"). The article also states that sales teams were cross-selling Livongo and Teladoc products, despite challenges.  J.A. 1097 (describing Teladoc's efforts to "sell Livongo's services," and reporting that "[b]ig companies have been more receptive to buying combined Livongo and Teladoc services").[14]

To summon inconsistency between the article and the sales team statements, plaintiffs point to three other observations in the *Business Insider* article: that the rushed union made it "difficult" to work with customers; that the sales team had a hard time navigating separate internal systems and did not have "each other's full product details"; and that the attrition of Livongo employees added "confusion" to the sales process.  Br. 75-76 (emphasis omitted). None of these observations, however, discloses that the sales teams were not fully integrated, as Gorevic allegedly misstated.  Employee attrition, product confusion, and the other challenges identified in the article are not the *subject* of Gorevic's sales team statements, as this Court's precedent requires. *See In re Omnicom Group*, 597 F.3d at 511-512 (declining to rely on a publication

---

[14] Plaintiffs allege in the complaint that the *Business Insider* article revealed "for the first time that the Livongo integration was not completed or proceeding smoothly."  J.A. 183, ¶ 437.  But the sales team integration statement is not about the integration *writ large*, nor did Gorevic warrant that no challenges in integration had arisen.

amounting to a "negative characterization of already-public information" because it did not "reveal some then-undisclosed *fact* with regard to the specific misrepresentations") (emphasis added).

*Second*, plaintiffs rely on Teladoc's April 27, 2022 quarterly earnings announcement, which relates to plaintiffs' dismissed-and-abandoned competition theory. Plaintiffs now argue that Teladoc's $6.6 billion goodwill impairment charge was "specifically linked" to integration issues. Br. 77. That is mistaken. *See, e.g.*, J.A. 188, ¶ 454. Teladoc did not attribute the goodwill impairment or the lowered projections to integration. To the contrary, it expressly identified external "market dynamics" like increased competition, J.A. 126, ¶ 272, largely driven by BetterHelp—an entirely different business from Livongo, J.A. 187-189, ¶¶ 453-456. The only mention of integration was Gorevic's statement that the integration of Livongo products into the "whole-person care experience" was ongoing. J.A. 187, ¶ 451. But defendants had repeatedly said that product integration was ongoing. *See* pp. 6-9, *supra*. That Teladoc had been "working on integrating the Livongo products," but was "not done" yet, J.A. 1196-1197, does not "correct" Gorevic's statements that the sales teams were integrated, or Verstraete's statement about marketing data integration, or the 10-K risk disclosure.[15]

───────────────

[15] Plaintiffs suggest that analysts "link[ed]" the goodwill impairment to integration problems. Br. 76-77. But the analyst reports plaintiffs cite, J.A. 126-128 ¶¶ 274-277, do not attribute the impairment to any new information about

*Third*, plaintiffs rely on Teladoc's July 27, 2022 announcement of disappointing financial results and an additional $3 billion goodwill impairment charge. Plaintiffs say that defendants "attributed" the financial results to "the impact of unresolved Livongo integration issues" and "linked the competition and integration issues." Br. 77. As the complaint reveals, Teladoc said no such thing. Rather, in response to a question—"What do you think is necessary to . . . get deal activity going again?"—the complaint alleges that "the Company[]" stated that, since many competitors have only "point solutions," Teladoc would gain a competitive advantage by integrating its "three separate apps," which were "not yet fully integrated," and then present itself as a "one stop shop." J.A. 201, ¶ 499 (emphasis omitted). In other words, future product integration could give Teladoc a competitive edge. This does not attribute past performance to the subject of any challenged statement.

---

integration status revealed by the April 2022 earnings release, *see* J.A. 1228-1304. At most, the reports mention previously disclosed integration challenges, and "[c]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *See Central States, Southeastern & Southwestern Areas Pension Fund* v. *Federal Home Loan Mortgage Corp.*, 543 Fed. Appx. 72, 75 (2d Cir. 2013) (summary order) (citation omitted). Even if analysts had linked competition issues with integration, that still would not reveal facts on the specific subjects of the alleged misstatements. *In re Frontier Communications, Corp. Shareholders Litigation*, Civ. No. 17-1617, 2020 WL 1430019, at *25 (D. Conn. Mar. 24, 2020) (despite analyst commentary, loss causation not pleaded where "corrective disclosures refer[red] to the [a]cquisition in general" but not to the specifics of the alleged misstatement).

59

\*     \*     \*     \*     \*

In sum, none of the alleged corrective disclosures pleads loss causation. And if the *Business Insider* article had somehow "revealed" corrective information, the article would have "let the cat out of the bag" with respect to integration challenges, *see DoubleLine Capital LP* v. *Odebrecht Finance, Ltd.*, 323 F. Supp. 3d 393, 459 (S.D.N.Y. 2018), such that the April and July disclosures reveal nothing new as to the specific misstatements.

## III. THE DISTRICT COURT APPROPRIATELY DISMISSED WITH PREJUDICE AND DENIED LEAVE TO AMEND

After three rounds of motion to dismiss briefing, two district court decisions, and one prior appeal to this Court, plaintiffs are not entitled to any further opportunities to amend. Plaintiffs raise no argument on appeal that they are entitled to amend, and the Court should not entertain belated attempts to do so. *See*, *e.g.*, *Gross* v. *Rell*, 585 F.3d 72, 95 (2d Cir. 2009).

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ *Audra J. Soloway*

ABIGAIL FRISCH VICE
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*

DANIEL J. KRAMER
AUDRA J. SOLOWAY
DYLAN O. SMITH
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*
  *(212) 373-3000*
  *asoloway@paulweiss.com*

OCTOBER 24, 2025

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Audra J. Soloway, counsel for appellees and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4)(A), that the attached Brief of Appellees is proportionately spaced, has a typeface of 14 points or more, and contains 13,804 words.

/s/ *Audra J. Soloway*
AUDRA J. SOLOWAY

OCTOBER 24, 2025

## CERTIFICATE OF SERVICE

I, Audra J. Soloway, counsel for appellant and a member of the Bar of this Court, certify that, on October 24, 2025, a copy of the attached Brief of Appellees was filed with the Clerk through the Court's electronic filing system. In addition, I certify that copies of the Brief of Appellees will be sent, via third-party commercial carrier for delivery overnight, to the Clerk and the following counsel:

> Carol C. Villegas
> Irina Vasilchenko
> Matthew J. Grier
> Labaton Keller Sucharow LLP
> 140 Broadway
> New York, NY 10005

I further certify that all parties required to be served have been served.

/s/ *Audra J. Soloway*
AUDRA J. SOLOWAY